We'll hear the next case on the calendar, United States v. Lewis. Good morning, Your Honors. I represent Leon Lewis on appeal from his conviction for illegal reentry. The issue on appeal is whether Mr. Lewis should have been allowed to present his defense of acquired citizenship to the jury. The district court precluded the defense as a matter of law on the ground that he could not qualify for citizenship through his U.S.-born father because he was illegitimate and was not legitimated before he turned 21. The court held that he was not legitimated by operation of law under Guyana's Children Born Out of Wedlock Act, which made all children legitimate because the law left in place a prior means of legitimation, marriage of the parents. Now, this decision is contrary to BIA case law, holding that such a law, and this Guyana law in particular, did serve to legitimate children born out of wedlock, quote, that's matter of cross, the most recent BIA explanation of this issue. Cross held that the same kind of law in Jamaica legitimated a child for purposes of deriving citizenship from his naturalized father, despite the continued existence of an older law requiring marriage to legitimate a child. Cross reinstated and reaffirmed matter of guru, which held that this Guyana law at issue here eliminated all distinctions between illegitimate and legitimate children and thereby legitimated all children. And federal circuit law affirms that this kind of blanket statutory legitimation does confer legitimation. Lau V. Kiley in this circuit held a Chinese legitimation statute could legitimate for visa preference purposes. It also held that it need not consider other methods of legitimation because that would be superfluous. Is there a relevant distinction here between legitimation and having paternity established by legitimation? Our answer to that, Your Honor, is no. That is what the government's argument hangs on is that somehow there's a big distinction between those two sections just because of the phrasing, paternity established by legitimation in form of 1409 and legitimated under Section 1101, that the word paternity changes everything. But that was not the reasoning of Cross. Cross interpreted the term legitimation. It did not talk about paternity by being established. It was interpreting the term legitimation and held that the meaning of that term must vary depending on its statutory purpose. But legitimation and established paternity by legitimation are different words, right? It's not you're saying they should have the same. They do. They should have the same meaning. And we usually assume that when you have words that are expressed in different ways that they may mean different things. They may, but, Your Honor, in this case it makes no sense for them to mean different things given all of the holdings in this area. What's the textual evidence or the legislative history that you can cite for that? Well, I don't have legislative history, but we do have the purpose of the different statutes, as explained in Cross, that the purpose of the statutes that make legitimation a prerequisite for a benefit is to further the child's rights under the immigration naturalization laws, whereas the purpose of Section 321, which all the case law has held, this interpretation of the Guianese statute is limited to cases under former Section 321. That statute interpreted paternity established by legitimation very narrowly because under that statute legitimation is a barrier to the child's right to derive citizenship through his naturalized mother. So what Cross explained is that it only makes sense. And Gracira also explained this. Did you give any deference to the BIA's interpretation of either Jamaican or Guianese law? Yes. Why? Because— Why is that within their wheelhouse to tell us what their statutes mean? Well, even if you don't have to give deference, I would point out, Your Honor, that this— That's what I mean, though. Like in Chevron, it's usually because the administrative agencies know something that we don't know about their statutes. Well, they know— Their regulations here, they're interpreting foreign law. Why do we defer to them on that? Well, what they're actually interpreting is whether this foreign law can serve to legitimate under the INS statutes. So that is within their wheelhouse to interpret the term legitimate and what that means. But I'd like to point out that federal case law has also held the same. And Lau V. Kiley, this Court— For Governor Gracira, Judge Underhill, I think you cited a lot for analyzing the statute here. Well, it didn't analyze the statute here. It analyzed a very— Well, Your Honor, and that's where we disagree. It analyzed a very different statute. It analyzed Section 321, which prohibits a child from acquiring derivatives— an unwed or formerly illegitimate child— from acquiring derivative citizenship through his naturalized mother if paternity has been established by legitimation of his foreign alien father. In other words, it poses an obstacle to citizenship through the mother based on the parental rights of the father. Gracira explained its holding in those terms. It explained that this statute does nothing except further the parental interest. It was intended to further the father's interest. And at least under those circumstances, the father must do something. To get to the conclusion of Gracira about he could derive citizenship under his mother, Judge Underhill had to first decide whether the legitimacy issue was decided through the father's non-marriage to the mother. So it's the same analysis. It just arrives at a different place, right? Well, it's not the same analysis. It's a conclusion. What's otherwise about the father, he would not have been able to get citizenship through his mother. Right. Because the conclusion in Gracira was he's a citizen. Right. And all of these cases, by the way, Roe, Hines, Gracira, all of the cases that interpret Section 321 and require an affirmative act by the father, as opposed to all the other cases that deal with other sections that don't require an affirmative act by the father, all of those cases are cases in which the claimant, the claimant to citizenship, did get citizenship through his naturalized mother. And let me just also point out that the application of the law, the general law on legitimation, which is that a blanket statutory legitimation does legitimate a child, the application of that general rule to 321 would make no sense at all. Because in such a case, a child could never, if he was born in a country that had such a statute, he could never establish citizenship through his naturalized mother, no matter if his father beat him, threw him out the window, whatever the father did. So it makes total sense to require in that situation an affirmative act by the father. And that's the distinction that Cross makes, and Gracira includes that as part of its rationale. What do we know about the extent to which the Legitimacy Act in Guyana is enforced or not? I don't know anything about that. Whether it's enforced? I mean, isn't this a different case if it turns out that there is the removal of the Discrimination Act in Guyana, but the Legitimacy Act is not enforced? Oh, the prior act? Yeah. Well, we contend that it doesn't matter. I would focus on Lao. Lao involved the same, almost identical, I mean, the same statute in China, which said that children born out of wedlock shall enjoy the same rights as children born in lawful wedlock. No person shall be allowed to harm them or discriminate against them. This Court held, it is clear to us that the first paragraph of this article makes all children born in China legitimate, and we don't even have to look, continued, that we don't even have to look at what other provisions they have for legitimation, because that would be superfluous. That's what this Court held, and that's basically what Cross held in analyzing the Jamaican statute, that it doesn't matter if there's this other thing on the books. Somebody who wants to legitimate their child could still do it, presumably, but it wouldn't affect the child's rights. Maybe it would affect... In this case, the Guyana Act is not, the Legitimacy Act is not enforced. Doesn't that affect your argument? Then this is a different, you're saying it doesn't matter whether the act is on the books or not. Right. But if it's not on the books, right, then you have a different case. I don't think it would be any different. That's what I'm not... I don't think it would be a different case. It might be even a stronger case if the act was not on the books, but the cases hold that it doesn't matter whether it's on the books or not, because it was basically superseded by the blanket legitimizing statutes. How does a general legitimation statute establish paternity? Well, that's the thing. There are two different concepts, and this Court has explained in Laos there are different concepts, and Anderson v. Holder, the Ninth Circuit, has explained that there are two separate concepts. One is legitimacy, which is purely a legal concept, and the other is biological paternity. Biological paternity still has to be established.  We hold that the Chinese statute legitimates everyone, but any individual still has to establish the biological paternity, which in this case the defendant would have had to establish. The defendant would have had to prove at trial that he actually was the biological son or at least show a reasonable possibility to create a reasonable doubt that he was the son of this man, Mr. Huiyu, that Mr. Huiyu was, in fact, a U.S. citizen. All the other facts, all the facts were disputed, but the Court didn't allow this to get before the jury. The Court precluded as a matter of law, based on an incorrect reading of the case law, which I have to stress that Gorsera, Roe v. Hines, Roe and Hines have all been expressly overruled to the extent that they apply to anything other than Section 321, which makes legitimation a barrier to citizenship. Thank you. You'll have a few minutes in rebuttal. Okay. Good morning, Your Honors. May it please the Court. My name is Caitlin Farrell. I'm an Assistant United States Attorney for the Eastern District of New York, representing the United States in this matter. At age 52, facing his second criminal conviction for illegal reentry, the appellant, Leon Ira Lewis, claimed for the first time that a dead U.S. citizen named Leroy Huiyu was his biological father. The core issue in this appeal is, even assuming the truth of that claim, whether he could have acquired United States citizenship through Huiyu. As the District Court correctly held, the answer to that question is no. The District Court, therefore, correctly precluded the appellant from presenting any such evidence at trial because it would have been irrelevant and confused the jury. Now, in order to have acquired United States citizenship through his purported father, Leroy Huiyu, the appellant's paternity must have been established by age 21 by legitimation. That comes from Section 309 of the 1952 Immigration and Nationality Act. Now, crucially, whether the appellant's paternity, in other words, who his father is, was established by the requisite time, by the time he was age 21, and means, by legitimation, is an entirely different inquiry from whether he is considered a legitimated child for the purposes of the definition section of the 1952 Act as interpreted by the Bureau of Immigration Appeals. Now, to be clear, the government does not dispute that Guyana's 1983 Removal of Discrimination Act removed certain discriminatory provisions of the law that was against children born out of wedlock. And the government also does not dispute that the BIA case law establishes that all children in Guyana are considered to be legitimated under that act for the purposes of the definition section of the 1952 Immigration and Nationality Act. What about the prior act? Is that still on the books? Is it enforced? Do you mean the Legitimacy Act in Guyana? It is still on the books. I'm not sure if to this day, 2019, it's still on the books, but as it pertains to the appellant in this case, during the time frame that it would apply to him, it was still on the books. So let's say that kind of act is not on the books. Then all you have is the general legitimation statute. And in that circumstance, the general legitimation statute, in your view, would be sufficient? So that exact scenario is what happened in Anderson v. Holder in the Ninth Circuit and also in Lau v. Kiley. And the important point that both of those cases make is in each of those cases, the paternity was not in dispute. And so in a circumstance where the paternity of the child is not in dispute and there's no legitimacy act on the books and out-of-wedlock children and in-wedlock children are considered identical under the law, then you have an entirely different scenario. My confusion is what is sufficient if there is no formal legitimation process becomes insufficient when there is such a process? And I'm trying to understand, commonsensically, why that should be. So the law requires that if there is a legitimation process under the law of the residence or domicile of the child or father, that you have to look to that. In the case of China and Arizona, as are discussed in Lau v. Kiley and Arizona and Anderson v. Holder, respectively, neither of those jurisdictions have the concept of legitimacy. And so the fact that paternity is not disputed in that case is sufficient to satisfy Section 309 of the Act. Or in those cases, they were actually talking about Section 321, which deals with naturalization, not birthright citizenship. But to your question, Your Honor, if there is a legitimacy statute on the books and it requires an affirmative act by either the parent or the child, then that has to be done in order to satisfy the paternity by age 21 by legitimation requirement of the Immigration and Nationality Act. And so to the extent you're concerned about hypotheticals where there is not such an act, you can look to Anderson v. Holder and Lau v. Kiley to see how courts have dealt with that situation. And in both circumstances, the court recognized that paternity was actually not in dispute in either of those cases. Anderson v. Holder noted, however, that had the paternity of that child been in dispute, it in fact would not have been sufficient for him to simply be legitimated by operation of law and that they would have had to turn to the paternity statutes on the books in Arizona. But that was not the case there. It is, however, the case here. Clearly his paternity is in dispute because the defendant only for the first time claimed that this man was his father at age 52 at trial in 2017. Are there countries, to your knowledge, besides Guyana and Jamaica, that essentially have no functional difference between children of wed and unwed parents but still have these vestigial provisions requiring the formal step to legitimate a child? Yes, Your Honor. I'm trying to get a sense of what the reach of all this is. Certainly. So yes, Your Honor. Appended to Gorsera v. Loy, which is the District of Connecticut case, is a law library of Congress memorandum that analyzes the Guyana statute and it compares it to the Jamaica statute and notes that many of these Commonwealth countries that were at some point territories of the United Kingdom contain a similar statute to that of Jamaica. And that memorandum also points out the distinction between Jamaica and Guyana's laws. Specifically, the Act in Jamaica and also similar ones across these Commonwealth countries specifically states that you cannot discriminate against children born out of wedlock. Whereas in Guyana, the Removal of Discrimination Act does not contain such a provision. It amended the laws in order to remove words that weren't politically correct. It substituted out of wedlock for illegitimate. But it doesn't actually contain an affirmative provision saying the government cannot discriminate against children born out of wedlock. So at least theoretically, Guyana could pass a law that discriminates against children who are born out of wedlock and that would not be in conflict with Guyana's Removal of Discrimination Act. And that's different from Jamaica and these other Commonwealth countries. One issue I'd like to address is in the Federal Defender's reply brief, they point out that our position, the government's position, creates a situation where children attempting to get United States citizenship through parents who were born in the U.S. is more onerous than children attempting to get United States citizenship through a parent that is naturalized. And that's simply not true. And the court, Judge Ammon's opinion in footnote 4, addresses that exact issue. And specifically what she says, and the position that we take, is that if you're attempting to get citizenship through naturalization, you have to prove both that you're in that parent's legal custody and also you have to be legitimized by the time you're 16 years old. Those provisions don't apply to people who are seeking to get United States citizenship from a parent who is a United States citizen. What they have to show is that their paternity was established by legitimation at age 21. And so it's simply not true that it's harder to get United States citizenship through a naturalized parent as opposed to a parent who has birthright citizenship. Going back to Anderson, is it your view that Anderson was correctly decided? That's a good question. Yes, in those circumstances, because the Arizona law contained no concept of legitimacy whatsoever versus the law here in Guyana clearly contains a provision by which you can become legitimated, and that's through your parent's marriage. And importantly, in addition to the fact that there was no dispute over the paternity of that child, Judge Ammon also noted that the Ninth Circuit, in a separate opinion from Anderson, observed that Guyana, unlike Arizona, does contain a legitimacy statute that requires the affirmative marriage of the parents in order to show that you're a legitimated child. So I know you've gone over this, but just so that I can understand, I'm still not quite understanding. If a general legitimation statute suffices to establish paternity by legitimation as Anderson holds, then why would the vestigial formal legitimation process ever change anything? Well, Anderson is very clear that that's only the case if paternity is not disputed. So in Anderson, everyone agreed that this particular person was his father. And so because there was no concept of legitimacy under the Arizona law, just the statute itself saying that all children are on equal footing was sufficient to establish paternity by legitimation under the law of Arizona. But the Ninth Circuit very clearly notes that if there had been a dispute about who the father was, then just that statute would not have been sufficient, and that they would have had to turn to the paternity statutes in Arizona to determine whether his paternity was in fact established by age 21. Thank you. Your Honor, I'd like to first address the government's argument that the Guiana statute doesn't eliminate discrimination. It doesn't include any broad provision of nondiscrimination against illegitimate children. And I would just read it. In determining relationships for the purposes of this section, and this is the family relations section, no regard shall be had to whether any person is born in wedlock or out of wedlock, and a person born out of wedlock shall be entitled to the same rights under this section as a person born in wedlock. And the title of the act is, in parentheses, is the Anti-Discrimination Act, or something to that effect, the law against discrimination against unwed children. It is basically the same provision as the Chinese law that Lao accomplished statutory legitimation. Now, just to answer Your Honor's sort of inquiry as to why this old legitimation method might still be on the books, one possibility is that under the anti-discrimination law of Guiana, the removal of distinctions between illegitimate and legitimate children, there is one exception provided, which is that the father cannot inherit from a child that he has not somehow acknowledged. There's more for the father to take the child's money. Now, maybe that would be something that the child can only accomplish through the vestigial, the otherwise vestigial legitimation provision. That's one possibility. But in terms of the child's rights, which is what matters for purposes of the statute, the child is not, there's no such thing as an illegitimate child. The child is legitimated. The fact that paternity is not in dispute does not matter. In Lao, the facts of paternity, biological paternity, were not established. Lao went on, after holding that the Chinese statute legitimated everybody, that they still had to look to what facts supported the biological link, the biological father-son relationship. That is a separate issue. Anderson held, in our view, the question of paternity is ultimately a simple one. Anderson's paternity is established by the very statute that establishes his legitimacy, and that is consistent with Guru Hu, which says that all children are deemed to be the legitimate offspring of their natural parents from the time that country's laws are changed. So when the laws are changed, paternity by legitimation is established in a general sense. That child is the legitimate son of his natural biological father. What needs to be established under the statute, and that's under a different section, which is whether he is the child born of, or he was born to, born of, an American father under the 1409, that is the fact of biological paternity, which must be separately established. But there was no ground in this case for the court to preclude the defense, entirely preclude it, on the basis of case law that has been limited specifically to Section 321 and doesn't apply to this provision. Thank you. Thank you both for your arguments. The court will reserve decision.